IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOHN DOE,                                )
                                         )
                 Plaintiff,              )
                                         )
          v.                             )
                                         )
DURHAM PUBLIC SCHOOLS BOARD OF           )
EDUCATION, CARL HARRIS, Ed.D.,           )
Individually and in his                  )
Official Capacity as former             )
Superintendent of Durham                 )
Public Schools; LETICIA JUDD,            )
Individually and in her                  )          1:17cv773
Official Capacity as former             )
Principal of Creekside                   )
Elementary School, NATHAN                )
HESTER, Individually and in             )
her Official Capacity as                 )
former Assistant Principal of           )
Creekside Elementary School,             )
and GINA WATRING, a/k/a GINA            )
BERGMAN, a/k/a GINA CORDERO,             )
                                         )
                 Defendants.             )


**MEMORANDUM OPINION AND ORDER**


THOMAS D. SCHROEDER, Chief District Judge.

     This civil action arises out of the alleged sexual assault

and rape of a student by a former dance teacher at the Creekside

Elementary School ("Creekside") of the Durham Public Schools

("DPS").   Plaintiff John Doe, having now reached the age of

majority, brought this action against the DPS Board of Education

("School Board"); Carl Harris, its former Superintendent; Leticia

Judd and Nathan Hester, Creekside's former Principal and Assistant

Principal, respectively; and Gina Watring, a former dance and drama teacher at Creekside. (Doc. 1.) Defendants School Board, Harris, Judd, and Hester ("DPS Defendants") moved to dismiss certain claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 11.) Doe filed a "Conditional Motion for Leave to File Amended and Substituted Complaint." (Doc. 20.) A hearing was held on both the motion to dismiss and the conditional motion to amend, and the court denied Doe's conditional motion to amend without prejudice because he failed to attach a proposed amended complaint as required by Local Rule 15.1. (Doc. 22.) Doe filed a corrected motion (Doc. 23) and proposed pleading (Doc. 25-1), which eliminates Harris as a defendant (Doc. 24 at 2). The motions have been fully briefed and are ready for consideration. (Docs. 12, 15, 16, 24, 27, 28.) For the reasons set forth below, the motion to amend will be granted in part and denied in part, and the motion to dismiss will be granted.

## I. BACKGROUND

### A. Complaint

The allegations of the complaint, which are accepted as true and viewed in the light most favorable to Doe for purposes of the present motions, show the following:

During the 2008-2009 school year, Doe was enrolled as a fourth grade student at Creekside. (Doc. 1 ¶ 28.) One of his teachers was Watring, who taught dance and drama. (Id. ¶ 29.) In the fall

of 2008, Watring began developing inappropriate "friend" relationships with Doe and other students whom she singled out for favoritism. (Id. ¶ 33.) She showed special attention to Doe, placing him in the front row of her classroom and giving him extra candy and prizes in class. (Id. ¶ 32.) Outside of class, she placed herself in close physical contact with Doe, frequently hugging him and spending time with him during lunch. (Id. ¶¶ 31-32.) Doe regularly visited Watring's classroom both before and during school hours, often at Watring's invitation. (Id. ¶ 43.) Watring conducted her classes in a school modular classroom trailer located on the campus, whose door locked from the inside and windows had coverings. (Id. ¶ 42.) When Doe was dropped off for school in the mornings, he would often meet Watring in her classroom trailer before class and was frequently late to his homeroom class as a result. (Id. ¶¶ 44-45.) The trailer was in plain view of Creekside employees and school officials due to its location near the playground. (Id. ¶ 44, 52.)

Watring also gave Doe rides home from school in her car, even though she lacked proper authorization to do so. (Id. ¶¶ 34-40.) Creekside had a policy of keeping a list of authorized adults to take each child home from school, requiring parents to sign a form indicating which adults had permission to pick up the child. (Id. ¶ 36.) A non-parent was supposed to show a special permission card to school employees in order to take a child home from school.

(Id.)  The relevant DPS Policy provided that "[i]n no case shall a person other than an authorized parent/guardian be permitted to take a student home from school until or unless the principal is satisfied that such person has the approval of the authorized parent/guardian."  (Doc. 1 ¶ 61; Doc. 1-1 at 1.)  DPS Policy further provided that "[i]t shall be the responsibility of the principal or his designee to determine that any person appearing at a school and requesting permission to take a student from the school is properly authorized to do so."  (Doc. 1 ¶ 61; Doc. 1-1 at 1.)

Doe was to ride the bus home from school every day, while Watring's children, who also attended Creekside, were to ride home in her car.  (Id. ¶ 35.)  Doe's mother initially gave verbal consent for Watring to drive Doe home, because Doe was friends with Watring's daughter.  (Id. ¶ 38.)  However, Doe's mother never provided written authorization per the school's policy and, subsequently, revoked her verbal permission later in the school year.  (Id. ¶¶ 39-40.)  Watring would sometimes take Doe out of the bus line "in plain view of other teachers and administrators" to drive him home.  (Id. ¶ 35.)  On many of these occasions, Watring would ask another teacher to place her own children on the bus, so that she could be alone with Doe.  (Id.)  Even after Doe's mother revoked her verbal permission, Watring continued to drive Doe home from school and drop him off down the street from his

4

house to conceal Watring's involvement from Doe's mother. (Id. ¶ 40.) Between January and March of 2009, at least five DPS employees observed, on different occasions, Doe leaving the school premises alone with Watring. (Id. ¶ 41.)

During the fall of 2008, Watring took Doe to a "Family Night" event at Creekside along with her own children, who were Doe's friends and attended the school. (Id. ¶ 48.) During the movie screening that was part of the event, Watring laid down very close to Doe on a blanket in full view of the individual DPS Defendants and school staff. (Id.)

In January or February of 2009, Watring gave Doe a cell phone to communicate exclusively with her both during and after school hours. (Id. ¶¶ 32, 49.) Watring and at least one other teacher regularly exchanged texts with students. (Id. ¶ 50.) This practice was known by other teachers at Creekside and by the DPS Defendants, although it is not alleged they knew that Watring gave Doe the phone. (Id.)[1]

On February 14, 2009, Doe brought Valentine's Day gifts to Watring and several other teachers. (Id. ¶ 54.) Doe received an oversized Hershey's chocolate kiss from another student, which he gave to Watring. (Id.) When the student complained, Doe was sent

_____

[1] At the time of Watring's arrest, it was estimated that she had exchanged approximately 4,000 messages with Doe through text messages, email, and instant messenger. (Doc. 1 ¶ 98.)

to the office of the principal or assistant principal as a result. (Id.)  A school counselor spoke with Doe about his behavior, but no additional investigation was undertaken regarding Doe's relationship with Watring.  (Id.)

Beginning in the fall of 2008 and continuing into the spring of 2009, Watring sexually abused Doe on at least eight occasions on school premises, and this sexual abuse ultimately escalated to rape.  (Id. ¶ 27.)  During some of Doe's visits to her classroom trailer, Watring would lock the door and sexually abuse Doe.  (Id. ¶ 46.)  On one unknown date in 2009, a school employee attempted to enter the trailer, but found it locked.  (Id. ¶ 53.)  The school employee reported the locked door to Principal Judd, but no action was taken by the DPS Defendants or Creekside employees.  (Id. ¶ 53.)  On no occasion is it alleged that anyone at the school knew of any sexual abuse.

In March of 2009, Watring transported Doe home from school without permission.  (Id. ¶ 59.)  She parked on a dirt road and proceeded to sexually abuse him.  (Id.)  But her car became stuck in the mud.  (Id.)  Another teacher from Creekside happened to pass by at the time and stopped to see if everything was alright. (Id.)  Doe exited the car and walked the rest of the way home. (Id.)  It is unclear whether the teacher ever reported the incident to school administrators, but no investigation was undertaken as a result.  (Id. ¶¶ 59-60.)  On two different occasions in March

2009, a teacher's assistant similarly observed Watring leave school with a male student in her car but made no report to school administrators. (Id. ¶ 78.)

At some point in February or March 2009, Ms. Barclift, Doe's homeroom teacher, submitted a behavioral report to school administrators in which she noted that Doe had made inappropriate comments in class regarding the size of his genitalia and discussed graphic details of male and female genitalia over lunch with fellow students. (Id. ¶ 56.) However, DPS Defendants did not undertake any investigation in response or notify Doe's parents about the report. (Id. ¶ 57.) Around this time, Barclift also received anonymous complaints that Watring was showing blatant favoritism towards Doe. (Id. ¶ 58.)

On March 17, 2009, Barclift submitted a written report to Principal Judd, Assistant Principal Hester, and other School Board employees detailing her concerns about the inappropriate behavior she observed Watring engage in around Doe and other students as well as complaints she had received from other students. (Id. ¶ 71-72.) The following day, Judd met with Barclift, Watring, and Hester. (Id. ¶ 72.) Barclift reported that Watring had engaged in inappropriate behavior with students, including taking bites out of students' food and hand-feeding food to students in the cafeteria, playing sexually suggestive and explicit music for students on her iPod during lunch, and encouraging students to

come to her classroom trailer without permission from other teachers. (Id.) In addition, Barclift reported that Watring showed favoritism to students, particularly Doe, and reported instances of Watring kissing Doe on the head and hugging him. (Id.) Barclift stated that she no longer felt comfortable sending her students to Watring's class. (Id.) Watring did not deny any of these allegations, but she sought to justify her actions on the ground that she was friends with many of the students and their families outside of school. (Id. ¶ 73.) Defendants verbally cautioned Watring to "draw a clear line so that students would understand that she [Defendant Watring] is their teacher at school" but did not further investigate her behavior. (Doc. ¶ 75 (alteration in original).)[2] At no time between the March 18, 2009 meeting and April 21, 2009, did the DPS Defendants notify Doe's parents of Watring's behavior toward Doe or that a special meeting had been called to address such behavior. (Id. ¶ 83.)

Beginning in mid-March through mid-April of 2009, Barclift observed Watring give Doe a bracelet with an engraving as well as

---

[2] The DPS Policy on "Student-Staff Relations" provided that "[a]ny employee who has reason to believe that another employee is inappropriately involved with a student . . . [including entering into a romantic or sexual relationship with a student] shall report this information to the Human Resources Department." (Doc. 1 ¶ 67 9alteration in original); Doc. 1-2 at 1.) The DPS Policy on "Sexual Harassment" also mandated that "all complaints of sexual harassment shall be promptly reported and thoroughly investigated" and provides that "a student does not have to report an incident of harassment to trigger an investigation if a school official knows or, in the exercise of reasonable care, should have known about the harassment." (Doc. 1 ¶ 74; Doc. 1-3 at 1.)

other special gifts, and she observed frequent inappropriate student-teacher behavior, including Watring hugging Doe several times a day and making other bodily contact with him. (Id. ¶ 79.) Barclift and at least one other teacher noticed an uncharacteristic change in Doe's behavior during this period as Doe began acting more withdrawn, engaged in talk of a sexual nature with other students that was mature for his age, and failed to abide by school rules, regularly arriving late to class. (Id. ¶ 80.)

On March 24, 2009, Barclift reported to Hester that she observed Doe going into Watring's classroom trailer before class. (Id. ¶ 81.) Hester subsequently stopped Doe in the hall with a late slip in the morning, and Doe stated that he had gone to Watring's trailer to "say hello." (Id.) Hester directed Doe to go straight to class and later emailed Watring to instruct her to tell Doe to go straight to class in the morning. (Id.) Hester did not conduct any further investigation into the incident. (Id.)

On March 31, 2009, Barclift reported to Judd that Watring had given bandanas to Doe and other students as gifts and became very upset upon learning from the school that the students could not keep them. (Id. ¶ 84.) Judd did not undertake any investigation into Watring's conduct, but rather instructed Watring to speak with the students involved and their parents about "being simply a teacher at school and nothing more." (Id.)

On April 20, 2009, Doe wrote Watring a love note, which read

"Gina, I love you sooo much babe. I'm lucky to have you. I'm glad you feel the same way. I want to be with you forever. I'd never do anything to hurt you. Love, [Doe]." (Id. ¶ 88.) The note was retrieved from a trashcan in the classroom by a classmate, who delivered it to Barclift. (Id.) Barclift gave the note to Hester the same day. (Id.)

The next day, April 21, Judd called Doe's mother for a meeting with Hester and Doe regarding the love note. (Id. ¶ 90.) Doe's mother told Judd that she had already instructed Watring to maintain appropriate boundaries with Doe and to stop bringing Doe home from school. (Id.) Doe's mother stated she had also spoken with Doe about maintaining an appropriate relationship with Watring and had taken the steps necessary to prevent personal contact between them outside of school. (Id.) Doe's mother explained that she believed her son had a crush on his teacher and that all contact between them outside of school had stopped. (Id.) Watring was then brought into the meeting and reported that her daughter, Emily, and Doe were boyfriend and girlfriend. (Id.) Watring reiterated that she had spoken with Doe's mother about limiting her relationship with Doe to that of a teacher and student. (Id.) No further inquiry, investigation, or remedial measures were undertaken by the DPS Defendants or other Creekside employees. (Id. ¶ 91.)

Shortly thereafter, Doe's mother alerted Judd that she found

another note, and Judd reported the situation with Watring to the School Board. (Id. ¶ 92.) At this time, a report was made to law enforcement. (Id.) On April 23, 2009, DPS Defendants and/or other Creekside employees began an investigation into Watring's relationship with Doe. (Id. ¶ 93.) Watring was subsequently arrested and pled guilty to sexual offenses against Doe that occurred beginning on March 1, 2009. (Id. ¶ 97, 100.)

Following Watring's arrest, Doe moved to a separate school in DPS where he was bullied and harassed by fellow classmates because of his relationship with Watring. (Id. ¶¶ 103-06.) Doe alleges that the School Board failed to provide DPS employees with reasonable notice or training as to its bullying and harassment policy. (Id. at 107-09.) As a result, Doe contends, DPS employees failed to identify or respond to this bullying and harassment. (Id. ¶ 110.) Doe ultimately dropped out of school in the fall of 2013. (Id. ¶ 111.)

**B.    Proposed Amended Complaint**

The proposed amended complaint reiterates most of the same facts as the original complaint but modifies them as follows:

The allegations eliminate the phrase "DPS Defendants," or titles of "principal" or "assistant principal" and instead specifies each Defendant by name. See, e.g. (Doc. 25-1 ¶¶ 20-22, 25, 30, 43, 45, 47–48, 56, 59-61.) The proposed amended complaint changes the full names of teachers and teaching assistants to their

initials to protect their privacy as they continue to be public employees. (Id. at 16 n.3.) Specific details are added to factual occurrences already alleged in the original complaint: it adds that Watring was forty years old (id. ¶ 24), that Barclift completed the behavioral report detailing Doe's discussion of his genitalia in or about February 2009, and that the report was made on an official School Board form and submitted to Hester by leaving it in a box outside his door for receiving documents, that Barclift did not receive a response to the report from Hester (id. ¶¶ 72–73), that Watring raped Plaintiff on April 9, 2009 as well as April 10 (id. ¶ 127), and provides the specific dates for each of the offenses to which Watring pled guilty (id. ¶ 142). The proposed amended complaint also adds information about Barclift's observations of Doe becoming "quiet, sad, unengaged, and unwilling to help in class," and of Watring seeing and touching Doe, giving him special gifts, eating lunch with him, and acting in front of other teachers and students "like they were in an adult relationship." (Id. ¶¶ 49–51.)

The proposed amended complaint adds facts about training at the school: it alleges that Barclift recognized the signs of an inappropriate teacher-student relationship between Doe and Watring from her training and experience working for a different employer (Doc. 53-1 ¶¶ 52–53), that Barclift had never received training from the School Board on how to recognize the signs of

inappropriate teacher-student relationships (id. ¶ 53), and that no teachers or teaching assistants at Creekside during the 2008–2009 year received any on the job training on how to recognize the signs of an improper teacher-student relationship or how to recognize grooming behavior (id. ¶ 109).

The proposed amended complaint adds specific details that several teachers were aware that Doe was leaving school with Watring while Watring's own children took the bus, that Watring was never on the list of adults authorized by Doe's parents to take him home from school, that Watring never possessed a "special card" showing that she had permission to take Doe home from school, and that Doe's parents were never asked to give written consent for anyone else to transport their child. (Id. ¶¶ 38, 40, 79–82.) It also adds that the teaching assistant who observed Watring taking a male student home in her car after school did not report the incident to anyone until she was questioned by law enforcement. (Id. ¶ 57.)

The proposed amended complaint adds the observations and opinions of other teachers about Watring's conduct: Watring's conduct toward Doe was the subject of conversation among other teachers (id. ¶ 33); a teacher observed Watring give Doe her own sweatshirt when Doe went to school without a jacket, but the teacher did not report the conduct to anyone (id. 25-1 ¶ 58); a substitute teacher and teaching assistant observed that Doe

changed from being happy to sad, would finish his work early to look out the window at Watring's trailer, and when asked what he was looking at, Doe's classmates would respond that he was looking at Watring's trailer because Doe and Watring were in a relationship (id. ¶ 64); students told a teaching assistant that they thought the teacher knew about the relationship between Watring and Doe (id. ¶ 65); a teaching assistant observed that when Doe went to the bathroom students would say that Doe had gone to see Watring (id. ¶ 66); on at least four occasions in spring 2009 Doe and other children snuck away from outside activities to go to Watring's trailer, that Watring directed the children to sneak off one by one to avoid detection (id. ¶ 67); students were heard by Barclift and a teaching assistant to tease Doe because Watring was giving him gifts (id. ¶ 68); a teacher observed Watring waiting in the hallway to wave at Doe, passing notes or stickers to Doe as he walked by, and the teacher thought Doe and Watring had a special relationship that was "more familiar than what she would be comfortable with" (id. ¶ 69); teachers and students were aware that Doe called Watring by her first name, "Gina" (id. ¶ 78); and Barclift's teaching assistant thought that Barclift was "flipped off" by Judd and Hester in their response to Barclift's complaints (id. ¶ 118). The proposed amended complaint also adds that Judd knew of the existence of the "Watring Club," a group of five or

six students Watring encouraged to spend extra time with her. (Doc. 25-1 ¶ 34.)

Watring's inappropriate conduct continued and "escalated" following the March 18, 2009 meeting with Judd and Hester. (Id. ¶ 121.) As of the end of March 2009 when Watring's conduct escalated to rape, neither of Doe's parents had been notified by Judd or Hester that a complaint had been made that their child was the subject of inappropriate conduct by a teacher. (Id. ¶ 125.) Added to the list of injuries Doe suffers as a result of the alleged misconduct is altered mental intellectual processing function. (Id. ¶ 156.)

## II. ANALYSIS

In his original complaint, Doe alleges six claims for relief. The first claim alleges that the School Board violated Title IX of the Educational Amendments of 1972 ("Title IX"), 20 U.S.C. § 1981. (Doc. 1 ¶¶ 115-28.) The second claim alleges constitutional violations by the School Board, Harris, Judd, and Hester, of Doe's "right as a public school student to personal security and bodily integrity and Equal Protection" under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983. (Doc. 1 ¶¶ 129-43.) The third claim alleges negligence by the School Board, Harris, Judd, and Hester. (Doc. 1 ¶¶ 144-52.) The fourth claim alleges negligent infliction of emotional distress against the School Board, Harris, Judd, and Hester. (Doc. 1 ¶¶ 153-58.) The fifth claim alleges battery by

15

Defendant Watring, and the sixth claim alleges intentional infliction of emotional distress by Defendant Watring, for which Doe seeks punitive damages pursuant to N.C. Gen. Stat § 1D-15. (Doc. 1 ¶¶ 159–72.)

DPS Defendants move to dismiss Doe's complaint as to all claims against Defendants Harris, Judd, and Hester. (Doc. 11 ¶¶ 1–3.) DPS Defendants move to dismiss the official capacity claims against Harris, Judd, and Hester on the ground that they are duplicative of claims alleged against the School Board, and they move to dismiss the individual capacity claims on the grounds that Harris, Judd, and Hester are entitled to qualified immunity and, alternatively, the complaint fails to state a claim upon which relief can be granted. (Doc. 11 ¶¶ 2–3; Doc. 12 at 11, 18.)

The proposed amended complaint alleges six claims for relief against various defendants. (Doc. 25-1.) The three claims against the School Board, for violations of Title IX, § 1983, and negligence, respectively, remain the same. (Doc. 25-1 ¶¶ 157–96.) The second claim for relief is amended to clarify that the § 1983 claim is brought against Judd and Hester in their individual capacities (Doc. 25-1 ¶¶ 129–43), and the third claim for relief is amended to clarify that the negligence claim is brought against Judd and Hester in their official capacities (Doc. 25-1 ¶¶ 187–96.) The amended complaint no longer alleges negligent infliction of emotional distress. The fourth claim alleges the same battery

claim against Watring, the fifth claim brings a new negligence claim against Watring, and the sixth claim is an alternative claim for intentional infliction of emotional distress against Watring. (Doc. 25-1 ¶¶ 197–219.)

The proposed amended complaint omits Harris as a Defendant and drops any claim for punitive damages against the School Board. Defendants do not oppose the withdrawal of either.

### A.   Standard of Review

Federal Rule of Civil Procedure 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  While district courts have discretion to grant or deny a motion to amend, leave should be "freely given" absent "any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Foman v. Davis, 371 U.S. 178, 182 (1962).

"When a proposed amendment is frivolous or advances a claim or defense that is legally insufficient on its face, the motion to amend should be denied." Joyner v. Abbott Labs, 674 F. Supp. 185, 190 (E.D.N.C. 1987).  "To determine whether a proposed amended complaint would be futile, the Court reviews the revised complaint

under the standard used to evaluate a motion to dismiss for failure to state a claim." Amaya v. DGS Constr., LLC, 326 F.R.D. 439, 451 (D. Md. 2018) (citing Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462, 471 (4th Cir. 2011)). "A motion to amend a complaint is futile 'if the proposed claim would not survive a motion to dismiss.'" Pugh v. McDonald, 266 F. Supp. 3d 864, 866 (M.D.N.C. 2017) (quoting James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996)).

The purpose of a motion under Rule 12(b)(6) is to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). To be facially plausible, a claim must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)). "Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual

18

allegations 'to raise a right to relief above the speculative level' so as to 'nudge[] the[] claims across the line from conceivable to plausible.'" Sauers v. Winston-Salem/Forsyth Cty. Bd. of Educ., 179 F. Supp. 3d 544, 550 (M.D.N.C. 2016) (quoting Twombly, 550 U.S. at 555). Mere legal conclusions are not accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Rather, the court must determine "whether the factual allegations, which are accepted as true, 'plausibly suggest an entitlement to relief.'" Sauers, 179 F. Supp. 3d at 550 (quoting Iqbal, 556 U.S. at 681).

### B. Motions to Amend and to Dismiss

Doe argues that his proposed amended complaint "reduces the number of parties, narrows the issues for decision, and clarifies the capacities in which the named individual defendants are being sued." (Doc. 24 at 7.) Defendants argue that the court should deny the motion to amend as futile and based on undue delay. (Doc. 27 at 12.) Because the court agrees as to the former, it need not reach the latter.

Defendants argue that Doe's motion to amend should be denied for futility, because the proposed amended allegations would be insufficient to overcome Defendants' motion to dismiss. (Doc. 27 at 12-13.) In sum, Defendants argue that Doe's individual capacity claims against Judd and Hester fail to state a claim under § 1983

19

and that the allegations are insufficient to overcome Judd and Hester's qualified immunity. (Doc. 27 at 13.) Doe contends that the proposed amended claims for individual liability under § 1983 are viable and that Defendants are not entitled to qualified immunity. (Doc. 28 at 2, 7, 11.) Defendants also argue that Doe's proposed amended claims are futile because the official capacity claims duplicate Doe's claims against the School Board. (Doc. 27 at 21–23.) Doe contends otherwise. (Doc. 24 at 13–16.)

In addressing the present motions, the court will first consider the pending motion to dismiss the complaint. As to any claim that should be dismissed, the court will then determine whether the proposed amended complaint would cure those defects or be futile.

### 1.    Pleading of Individual Capacity Claims

DPS Defendants first argue that Doe failed to adequately plead a claim as to Harris, Judd, or Hester in their individual capacity under either § 1983 or state law because the complaint fails to clearly state the capacity in which the Defendants are being sued. (Doc. 12 at 7.) As such, DPS Defendants contend that Doe's claims should be considered to have been made in their official capacity and dismissed as duplicative. (Id. at 7–11.) Doe contends the allegations are sufficient and, alternatively, notes that the proposed amended complaint makes such allegations clear. See (Doc. 25-1 ¶¶ 19–22, & at 52, 63.)

A plaintiff may bring a claim against a government official in his or her official and individual capacity under both federal and state law. Kentucky v. Graham, 473 U.S. 159, 165 (1985); Mullis v. Sechrest, 495 S.E.2d 721, 723 (N.C. 1998). The North Carolina Supreme Court has held that "when the complaint does not specify the capacity in which a public official is being sued for actions taken in the course and scope of his employment, we will presume that the public official is being sued only in his official capacity." White v. Trew, 736 S.E.2d 166, 167 (N.C. 2013). This court has recognized that "[a]lthough [the official capacity] presumption may exist under North Carolina law, it does not apply in the context of a Section 1983 suit." Huger v. Anderson, No. 1:12CV1242, 2014 WL 3107294, at *2 (M.D.N.C. July 7, 2014) (citing Biggs v. Meadows, 66 F.3d 56, 60 (4th Cir. 1995).

While the complaint's allegations and prayer for relief do not clearly delineate the capacity in which the defendants are being sued, the caption expressly states that the claims are being brought against the DPS Defendants in their individual and official capacities. (Doc. 1 at 1.) As Doe notes, DPS Defendants have cited no instance in which a plaintiff was found not to have adequately pleaded an individual capacity claim under either federal or state law where it was delineated as such in the caption of the complaint. (Doc. 15 at 5.) Nor is the court aware of any such authority. See Mullis, 495 S.E.2d at 724 ("For example, including

the words 'in his official capacity' or 'in his individual capacity' after a defendant's name obviously clarifies the defendant's status."). In addition to specifying the nature of the claims in the caption, the complaint asserts damages "jointly and severally" against all Defendants and seeks punitive damages as to the individual DPS Defendants, which are not recoverable in official capacity claims under § 1983. See Huger, 2014 WL 3107294, at *3 (finding plaintiff adequately stated individual capacity claim under § 1983 where complaint, among other things, sought punitive damages).

Therefore, the court finds that Doe's complaint has adequately pleaded individual capacity claims against the individual DPS Defendants under both § 1983 and state law.

### 2. Section 1983 Claims

#### a. Due Process Claims Against Individual DPS Defendants

##### i. Motion to Dismiss

Doe first alleges that the individual DPS Defendants violated his constitutional right to bodily integrity under the Due Process Clause. "Section 1983 imposes liability on state actors who cause the 'deprivation of any rights, privileges, or immunities secured by the Constitution.'" Doe v. Rosa, 795 F.3d 429, 436 (4th Cir. 2015). "Under established precedent, these constitutional rights include a Fourteenth Amendment substantive due process right

against state actor conduct that deprives an individual of bodily integrity." Id. at 436–37. Accordingly, sexual molestation of a student by a teacher is a constitutional injury for purposes of § 1983. Id. at 437; Baynard v. Malone, 268 F.3d 228, 235 n.4 (4th Cir. 2001).

"It is well settled that 'supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates.'" Baynard, 268 F.3d at 235 (quoting Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)). To establish supervisory liability under § 1983, a plaintiff must demonstrate the following:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices []; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Id. (quoting Shaw, 13 F.3d at 799). "[A]lthough not specifically mentioned in this articulation of the standard, a supervisor's failure to train his employees can subject him to liability where the failure to train reflects a 'deliberate indifference' to the rights of citizens." Armstrong v. City of Greensboro, 190 F. Supp. 3d 450, 466 (M.D.N.C. 2016) (quoting Layman v. Alexander, 294 F. Supp. 2d 784, 793–94 (W.D.N.C. 2003)).

"To establish the first element of actual or constructive knowledge, 'a plaintiff must show the following: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff.'" Armstrong, 190 F. Supp. 3d at 467 (quoting Shaw, 13 F.3d at 799). "[T]he absence of a pattern of factual, rather than conclusory, allegations, will fail to support the knowledge element." Id.

"To establish the second element, a plaintiff must allege either tacit authorization or deliberate indifference." Id. The Fourth Circuit has recognized:

> Deliberate indifference is a very high standard — a
> showing of mere negligence will not meet
> it. . . . Actions that in hindsight are unfortunate or
> even imprudent will not suffice. . . . Indeed, a
> supervisory official who responds reasonably to a known
> risk is not deliberately indifferent even if the harm is
> not averted.

Baynard, 268 F.3d at 236 (internal citations and quotation marks omitted).

As several courts have noted, "the law makes it difficult for a Plaintiff to successfully sue a school official for failing to detect or prevent a violation of a student's constitutional rights." Doe v. Lockhart ISD, No. 1:12-CV-869-JRN, 2014 WL 12580435, at *4 (W.D. Tex. Apr. 24, 2014) (citing Doe v. Dallas Indep. Sch. Dist., 153 F.3d 211, 219 (5th Cir. 1998)). A school official is not deliberately indifferent merely because the

measures he or she takes are ultimately ineffective in preventing a teacher from abusing students. Baynard, 268 F.3d at 236; Williams v. Fulton Cty. Sch. Dist., 181 F. Supp. 3d 1089, 1128 (N.D. Ga. 2016) (citations omitted). However, a school official who fails to reasonably respond to "mounting evidence of potential misconduct" by a teacher may, depending on the circumstances, be found to have acted with deliberate indifference. Baynard, 268 F.3d at 236; Williams, 181 F. Supp. 3d at 1128 ("[A] principal who fails to appropriately respond to repeated reports of a subordinate's abuse of students may, depending on the facts of the case, be said to act with deliberate indifference." (citations omitted)); compare Baynard, 268 F.3d at 235-36 (holding that a rational jury could conclude that the principal was deliberately indifferent due to the "failure to respond to mounting evidence of potential misconduct," including a previous allegation of sexual abuse by the teacher, and "desultory efforts at 'monitoring'" the offending teacher despite explicit orders from the superintendent), and Jennings v. Univ. of N.C., 482 F.3d 686, 701-02 (4th Cir. 2007) (holding that university official was not entitled to summary judgment as to plaintiff's § 1983 supervisory liability claim, where the official failed to take any action regarding plaintiff's complaint of sexual harassment), with Sanders v. Brown, 257 F. App'x 666, 672 (4th Cir. 2007) (holding that plaintiff failed to establish genuine dispute of fact as to

deliberate indifference where the principal's responses to complaints regarding alleged instances of sexual abuse by the accused teacher were "immediate, reasonable, and appropriate" and she "took direct and specific actions based on the results of her investigation" in the form of oral and written reprimands).

As to Harris, Defendants argue that the complaint fails to allege that he had actual or constructive knowledge of Watring's conduct. (Doc. 12 at 13.) Further, Defendants contend that the complaint makes no allegation of any specific act or omission on the part of Harris, apart from conclusory allegations regarding the "DPS Defendants." (Doc. 12 at 14.) In response, Doe cites to various portions of the complaint and asserts that the complaint's use of the term "DPS Defendants" is not so unduly vague as to warrant dismissal. (Doc. 15 at 8-10.)

"[I]n order to state a claim for supervisory liability, 'a plaintiff must plead that each [supervisory] defendant, through the official's own individual actions, has violated the Constitution." Evans v. Chalmers, 703 F.3d 636, 661 (4th Cir. 2012) (Wilkinson, J., concurring) (alteration in original) (quoting Iqbal, 556 U.S. at 676) (citing Robbins v. Oklahoma, 519 F.3d 1242, 1250 (10th Cir. 2008) (affirming dismissal of supervisory liability claim where complaint failed to "isolate the allegedly unconstitutional acts of each defendant")). Apart from referring to Harris in conclusory allegations made against "DPS

Defendants" collectively, the complaint does not provide any individualized allegation that he, as superintendent, was ever personally consulted regarding Watring's behavior or present for the relevant events in question. These collective allegations fail to state a plausible claim that Harris had actual or constructive knowledge that Watring posed an unreasonable risk of constitutional injury to her students. Absent additional factual allegations that Harris engaged in affirmative conduct that exposed Doe to a pervasive and unreasonable risk of harm, the complaint fails to allege a plausible claim that he acted with deliberate indifference. See Iqbal, 556 U.S. at 662; RM by & through MM v. Charlotte-Mecklenburg Cty. Bd. of Educ., No. 3:16-CV-00528-GCM, 2017 WL 2115108, at *7 (W.D.N.C. Mary 15, 2017); B.A.L. by & through Stephenson v. Laramie Cty. Sch. Dist. No. 1, No. 2:16-CV-00091, 2016 WL 10570871, at *6 (D. Wyo. Nov. 30, 2016). Therefore, the § 1983 due process claim against Harris in his individual capacity will be dismissed.

As to Defendants Judd and Hester, they first contend that they lacked actual or constructive knowledge to give rise to supervisory liability, contending that "at most" they were "on notice that Watring was showing favoritism towards students, including Plaintiff." (Doc. 16 at 9.) Defendants further argue that Hester's and Judd's responses, even if ineffective, are insufficient to establish deliberate indifference. (Doc. 16 at 9–

10.)  Doe reiterates his argument that he has alleged a plausible supervisory liability claim against all individual DPS Defendants. (Doc. 15 at 13.)

The complaint alleges that Watring groomed Doe for sexual abuse and engaged in suspicious behavior, some of which was in plain view of DPS Defendants, including showing overt favoritism toward Doe and other students, engaging in physical contact with Doe and open displays of affection (e.g., hugging him and kissing him on his head), driving Doe home from school without proper authorization, and permitting frequent visits by Doe to her classroom trailer without permission from other teachers.  (See e.g., Doc. 1 ¶¶ 32, 35, 44, 94.)  While Doe alleges that Watring engaged in suspicious behavior that could have been observable to the DPS Defendants, the complaint contains no allegation that any of the individual DPS Defendants was actually aware of such behavior prior to receiving Barclift's written report on March 17, 2009.[3]  While some Creekside employees observed Watring take Doe home from school, there are no allegations that any of the individual DPS Defendants was informed that Watring gave Doe rides home from school without proper authorization.  (See id. ¶¶ 41, 51, 59-60, 78.)  At no point were any of the individual DPS

---

[3] The complaint does allege that the individual DPS Defendants were notified of *Doe's* comments in class about his genitalia and his similar comments at lunch with his fellow students.  (Doc. 1 ¶ 56.)

Defendants ever informed of any allegation that Watring was sexually abusing Doe.

Even though Judd and Hester failed to detect or prevent Watring's sexual abuse of Doe, the complaint alleges that both Judd and Hester promptly responded to most reports of Watring's suspicious behavior.[4] After receiving Barclift's report on March 17, 2009, Judd and Hester held a meeting the next day with Watring and Barclift and verbally cautioned Watring about her behavior. (Id. ¶ 75.) On March 24, 2009, when Hester received a report from Barclift that she observed Doe going to Watring's trailer before class, Hester subsequently stopped Doe in the hallway when he had a late slip, questioned where he had been, and instructed him that he should go straight to class each morning. (Id. ¶ 81.) Hester also told Watring "to reinforce the message to [Doe] that he should come straight to class in the morning." (Id.) On or about March 31, 2009, Judd learned that Watring had become upset upon learning that Doe and other students were unable to keep the bandanas she gave them. (Id. ¶ 84.) Judd again cautioned Watring to speak

---

[4] In February or March 2009, Barclift submitted a behavioral report regarding Doe's inappropriate behavior to the DPS Defendants, but no further investigation into the report was undertaken and Doe's parents were not notified. (Doc. 1 ¶¶ 56-57.) The complaint alleges that "on an unknown date in 2009" a school employee reported to Judd that the door to Watring's trailer had been locked but DPS Defendants undertook no investigation or corrective action. (Doc. 1 ¶ 53.) Absent additional allegations, however, Judd and Hester's failure to respond to these reports does not rise to the level of deliberate indifference. See Baynard, 268 F.3d at 236.

with both the students and parents about maintaining a student-teacher relationship. (Id.) When Hester received Doe's love note that Barclift found in the trash on April 20, 2009, Judd called Doe's mother for a meeting the next day with Hester and Watring to discuss it. (Id. ¶ 88, 90.) At this time, Watring was confronted, but she deflected concerns with an explanation that her daughter and Doe were boyfriend and girlfriend, and Doe's mother explained her belief that Doe had a crush on Watring and that "the contact outside of school had stopped." (Id. ¶ 90.) After the meeting, Judd became aware that Watring had been observed texting before class. (Id. ¶ 92.) When Doe's mother subsequently reported that she had found another incriminating note, Judd promptly made a report to the School Board and alerted law enforcement on April 23, 2009. (Id. ¶¶ 92-93.)

Assuming (without deciding) that the complaint adequately alleges that Judd and Hester had constructive knowledge of an unreasonable risk of constitutional injury to Doe or any of Watring's students,[5] Doe fails to allege sufficient facts to make it plausible that either administrator acted with deliberate indifference. To be sure, the complaint alleges that Judd and Hester were made aware of behavior by Watring that went beyond

---

[5] Cf. Doe v. Russell Cty. Sch. Bd., No. 1:16CV00045, 2017 WL 1374279, at *9 (W.D. Va. Apr. 13, 2017) (holding that principal had actual or constructive knowledge of substantial risk of sexual abuse posed by custodian, even though alleged grooming behaviors could have been subject to benign interpretation).

merely showing favoritism towards students, including hand-feeding food to students in the cafeteria, encouraging students to come to her classroom trailer without permission, and regularly kissing Doe on the head and hugging him. (Id. ¶ 72.) But Judd and Hester collectively provided Watring with three warnings. Doe faults them for not conducting any additional investigation into Watring's behavior or taking steps to alert Doe's parents, and he faults the individual DPS Defendants for failure to adequately train school employees to identify and report instances of sexual abuse. See, e.g., (id. ¶¶ 69-70.)

While Judd's and Hester's responses ultimately may not have been effective, they do not amount to either deliberate indifference to, or tacit authorization of, Watring's behavior. Notably, neither Judd nor Hester is alleged to ever have received any statement or notice that Watring was sexually abusing Doe or anyone else at the school. Cf. Baynard, 268 F.3d at 236. While both Judd and Hester failed to take any action after receiving Doe's behavioral report from Barclift, they promptly held a meeting to discuss Barclift's subsequent report regarding Watring's behavior. And although Judd failed to take action regarding an employee's report to her that Watring's modular classroom door was locked at some unidentified date and time, there is no allegation that anyone knew whether Watring or Doe was inside or that the employee's report even suggested that. The complaint demonstrates

that upon receiving most reports of allegedly inappropriate conduct by Watring, both administrators acted promptly, albeit allegedly ineffectively. Cf. Williams, 181 F. Supp. 3d at 1128–29 (holding that plaintiff stated a § 1983 supervisory liability claim against principal where complaint alleged facts suggesting that principal knew offending teacher was "harming disabled students for three years and did nothing about it — or worse, took actions that may have condoned or encouraged it").

With all favorable inferences drawn in Doe's favor, the complaint's factual allegations plausibly suggest that Judd and Hester were at most negligent in responding to evidence of potential misconduct on the part of Watring but fail to meet the "very high standard" of deliberate indifference. Cf. Baynard, 268 F.3d at 236; cf. B.A.L., 2016 WL 10570871, at *4 (denying motion to dismiss § 1983 claim based on supervisory liability, where school principal had received multiple complaints regarding teacher's relationship with student over a two-year period, personally observed the teacher give the student a ride home from school in violation of school policy, and met with the teacher regarding her behavior on four separate occasions but failed to alert the child's guardian or take any substantive corrective action). Thus, the due process claims against the individual DPS Defendants will be dismissed.

### ii.  Futility of Motion to Amend

Doe's proposed amended complaint clarifies that the § 1983 claims are brought against Judd and Hester in their individual capacities.  (Doc. 24 at 8.)  It alleges that both are liable as supervisors of Watring, under both a general supervisory liability theory and a failure to train theory.  (Doc. 24 at 8; Doc. 28 at 2.)

### (a)  Supervisory Liability

Doe first alleges that the individual DPS Defendants violated his constitutional right to "personal security and bodily integrity" under the Due Process Clause.  (Doc. 25-1 ¶ 173.)  The proposed amended complaint changes the phrasing in several allegations from "DPS Defendants" collectively to the individual names of the DPS Defendants, to clarify what actions each individual DPS Defendant took.  Doe argues that Judd and Hester had actual or constructive knowledge to give rise to supervisory liability, and that Judd and Hester's inaction constituted deliberate indifference "to the open and obvious grooming and sexual assault of Plaintiff." (Doc. 24 at 11–12; Doc. 25-1 ¶ 175.)  Defendants respond that the proposed allegations do not demonstrate that Judd or Hester had actual or constructive knowledge of Watring's sexual abuse of Doe, or that their response showed deliberate indifference.  (Doc. 27 at 14.)

The proposed amended complaint adds numerous allegations of

33

instances where Creekside teachers observed suspicious behavior concerning Watring and Doe, but it does not allege that any of these observations were ever reported or made known to Judd or Hester. See (Doc. 25-1 ¶¶ 33-34, 57-58, 64-69, 78-82.) The proposed amended complaint contains no allegation that either Judd or Hester was actually aware of Watring's suspicious behavior prior to receiving Barclift's written report on March 17, 2009.[6] While some Creekside employees observed Watring take Doe home from school, there is no allegation that either Judd or Hester was informed that Watring gave Doe rides home from school without proper authorization. At no point was either Judd or Hester ever informed of allegations that Watring was sexually abusing Doe. Therefore, the facts in the proposed amended complaint fail to plausibly allege that either Judd or Hester had actual knowledge that Watring was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Doe.

It is a closer question whether Judd and Hester had constructive knowledge of an unreasonable risk of constitutional harm to Watring's students since the proposed amended complaint does allege that Judd and Hester knew or should have known that Watring was employing a number of grooming behaviors, including

---

[6] The complaint does allege that Barclift submitted a behavioral report to Hester in February 2009 that notified Hester of *Doe's* comments in class about his genitalia and his similar comments at lunch with his fellow students. (Doc. 25-1 ¶ 72.)

frequently inviting students to visit her classroom trailer without permission, being inappropriately physical with and obsessive over Doe in particular, frequently giving Doe rides from school alone, regularly displaying overt favoritism toward Doe and other students, and engaging in other inappropriate behavior such as hand-feeding students at lunch in the cafeteria, and that these behaviors were open, obvious, and known to several Creekside teachers. (Doc. 25-1 ¶¶ 32, 110, 175.) The amended complaint alleges that Judd or Hester could have easily learned about Watring's inappropriate conduct, as it was readily known by several teachers at Creekside and occurred in plain view at the school. Id.; cf. Doe by Watson v. Russell Cty. Sch. Bd., No. 1:16CV00045, 2017 WL 1374279, at *9 (W.D. Va. Apr. 13, 2017) (holding that principal had actual or constructive knowledge of substantial risk of sexual abuse posed by custodian, even though alleged grooming behaviors could have been subject to benign interpretation).

Were the court to assume (without deciding) that the proposed amended complaint plausibly alleges that Judd and Hester had constructive knowledge that Watring was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to students, it nevertheless fails to plausibly allege that Judd and Hester demonstrated either deliberate indifference to, or tacit authorization of, Watring's behavior. Notably, neither Judd nor Hester is alleged to ever have received any statement or notice

that Watring was sexually abusing Doe or anyone else at the school.
See Kline ex rel. Arndt v.Mansfield, 255 F. App'x 624, 628 & n.5
(3d Cir. 2007) (unpublished) (finding that school defendants were
not deliberately indifferent, but instead were merely possibly
negligent in failing to recognize a high risk of harm where the
inappropriate teacher-student behavior reported was visiting the
teacher's classroom without permission, but school officials had
no notice of any sexual misconduct); cf. Baynard, 268 F.3d at 236.

The proposed amended complaint adds several details regarding
the actions of Judd and Hester. It clarifies that Barclift's
behavioral report was submitted to Hester, Barclift received no
response regarding it, and Hester took no investigation in
response. (Doc. 25-1 ¶¶ 72-74.) The proposed amended complaint
also alleges that Judd and Hester failed to take any action after
an employee reported that Watring's trailer door was locked.[7] (Id.
¶ 59.) Doe also alleges that neither Judd nor Hester undertook an
investigation after he gave Watring Valentine's Day candy that had

---

[7] While the proposed amended complaint does add the allegation that the
employee attempted to enter Watring's trailer while Doe and Watring "were
inside embracing," there is no allegation that the employee saw or knew
that Doe and Watring were inside the trailer, since the employee "could
not get in because the door was locked." (Doc. 25-1 ¶ 59). There is
also no allegation that any report of Watring and Doe's presence inside
the trailer was made to either Judd or Hester, but only that "the school
employee reported the door being locked to Defendant Judd, or to
Defendant Hester." (Id.) Thus, the additional factual allegations about
this incident do not change the court's analysis of whether Judd's or
Hester's responses to reports of Watring's inappropriate behavior toward
Doe amounted to deliberate indifference.

been given to him by another student and the school counselor spoke with him about it. (Id. ¶¶ 60–61.) Doe argues that the proposed amended complaint alleges that after receiving written notice of Watring's inappropriate behavior on March 17, 2009, and verbal notice on March 18, 2009, Judd and Hester failed to conduct any investigation or take any remedial measure that would have protected Doe. (Id. ¶ 110, 112, 117; Doc. 28 at 10.) But the allegations still indicate that Judd and Hester took prompt action in response to most reports or incidents.

After Barclift complained to Judd about Watring's inappropriate behavior and favoritism toward students in January or February 2009, Barclift and Judd met on three separate occasions between January or February and early March to discuss Watring's inappropriate behavior. (Doc. 25-1 ¶¶ 87–88.) After Barclift presented her written concerns to Judd on March 17, 2009, Judd held a meeting with Watring, Barclift, and Hester the next day, during which Judd instructed Watring "that her inappropriate behavior had to stop and that she should draw a 'clear line' between herself and her students regardless of whether she knew them personally." (Id. ¶¶ 110–13.) Judd and Hester gave Watring a verbal warning to "draw a clear line so that students would understand that she [Defendant Watring] is their teacher at school." (Id. ¶ 116.) When Barclift reported to Hester that she saw Doe going to Watring's trailer before class, Hester stopped

Doe and spoke with him, telling him to go straight to class in the morning; and, that same day, Hester emailed Watring to remind her to "reinforce the message to Plaintiff that he should come straight to class in the morning." (Id. ¶ 122–23.) When Barclift told Judd on March 31 about Watring giving students bandanas as gifts, Judd told Watring to "speak with the students involved and their parents about Watring being simply a teacher at school and nothing more." (Id. ¶ 126.) When the love note Doe wrote to Watring was found on April 20, Judd and Hester met the next day with Doe's mother to discuss the note and held a separate meeting with Watring to discuss it. (Id. ¶¶ 130–31.) After the April 21 meeting, when Doe's mother reported another note to Judd, Judd reported the situation to the office of the superintendent and to law enforcement authorities, and on April 23, the investigation into Watring's inappropriate conduct began. (Id. ¶¶ 133–34.)

The proposed amended complaint demonstrates that each time a complaint about Watring was reported to Judd or Hester, both took reasonably prompt remedial action (in most instances within a day),[8] even though the action was ineffective. Cf. Williams, 181 F. Supp. 3d at 1128–29 (holding that plaintiff stated a § 1983

---

[8] The proposed amended complaint is not clear about what day Doe's mother found the second note, but it does make clear that the investigation into Watring commenced on April 23, 2009, two days after Judd and Hester's meeting regarding the first note, indicating that, if the second note was found on the same day as the April 21 meeting, the investigation began at most two days after the report triggering the investigation was made. (Doc. 25-1 ¶¶ 133–34.)

supervisory liability claim against principal where complaint alleged facts suggesting that principal knew offending teacher was "harming disabled students for three years and did nothing about it — or worse, took actions that may have condoned or encouraged it").

Doe alleges that Judd and Hester acted with reckless indifference to the safety of students, including Doe, by relying upon Watring, a pedophile, to create and enforce an appropriate boundary between herself and her students. (Doc. 25-1 ¶ 135.) But there are no facts alleged in the amended complaint indicating that Judd and Hester knew or should have known that Watring was a pedophile who was unable to create appropriate boundaries with her students; there are no allegations of prior inappropriate conduct by Watring or that any reports of <u>sexual</u> misconduct or <u>sexually</u> inappropriate behavior were made to Judd and Hester. <u>See</u> <u>Kline</u>, 255 F. App'x at 628 & n.5 (finding that, where the record "did not show that the school officials had notice of any sexual misconduct," they were not deliberately indifferent but were at most negligent in failing to recognize a high risk of harm); <u>cf.</u> <u>Baynard</u>, 268 F.3d at 233 (finding that the principal had constructive knowledge of an unreasonable risk of constitutional injury to students after being told from several sources that the abusive teacher was a pedophile who had sexually abused former students, and the principal also saw a student sitting in the

teacher's lap); Jennings, 482 F.3d 686 (where the university received reports of the soccer coach making explicitly sexual comments to the students, engaging in sexual touching with students, and interrogating students regarding their sex lives). Given that the reports to Judd and Hester about Watring detailed inappropriate student-teacher boundaries, rather than conduct of a sexual nature, these facts fail to demonstrate that Judd and Hester's responses to their knowledge of the situation was so inadequate as to show deliberate indifference or tacit authorization of Watring's behavior.

Drawing all favorable inferences in Doe's favor, the court finds that the factual allegations of the proposed amended complaint plausibly suggest that Judd and Hester were at most negligent in responding to evidence of potential misconduct on the part of Watring but fail to meet the "very high standard" of deliberate indifference. Baynard, 268 F.3d at 236; cf. B.A.L., 2016 WL 10570871, at *5. Therefore, the motion to amend as to Doe's general supervisory liability claims against Judd and Hester will be denied as futile.

### (b)  Failure to Train

An allegation of a failure to train can be the basis for liability under § 1983 if the failure to train amounts to deliberate indifference to the rights of students and the lack of training is closely related to the ultimate injury. See City of

<u>Canton v. Harris</u>, 489 U.S. 378, 387, 391 (1989).  A failure to train claim has three elements:

> (1) the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to train properly the subordinates thus illustrating a "deliberate indifference" to the rights of the persons with whom subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the plaintiff's rights.

<u>Lacy v. DeLong</u>, No. 2:13-cv-14813, 2016 WL 3566242, at *9 (S.D.W. Va. June 27, 2016) (quoting <u>Brown v. Mitchell</u>, 308 F. Supp. 2d 682, 701 (E.D. Va. 2004)).

To meet the "stringent standard of fault" created by the deliberate indifference requirement, "a plaintiff must identify a 'specific deficiency rather than general laxness or ineffectiveness in training.'" <u>Brown v. Cobb</u>, No. 3:17-cv-00627-JAG, 2018 WL 6304405, at *3 (E.D. Va. Dec. 3, 2018) (first quoting <u>Bd. of Cty. Comm'rs v. Brown</u>, 520 U.S. 397, 410 (1997), then quoting <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1390 (4th Cir. 1987)). Deliberate indifference can be established when allegations show either "continued adherence to an approach [school officials] know or should know has failed to prevent tortious conduct by employees" or "a pattern of tortious conduct by inadequately trained employees." <u>Bd. of Cty. Comm'rs</u>, 520 U.S. at 407–08. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of

constitutional rights." Connick v. Thompson, 563 U.S. 51, 62 (2011). "Notice can be established by showing that the need for the training and the risks of not providing the training were obvious." Doe by Watson v. Russell Cty. Sch. Bd., 292 F. Supp. 3d 690, 711 (W.D. Va. 2018) (citing Canton, 489 U.S. at 390; Jordan ex rel. Jordan v. Jackson, 15 F.3d 333, 341 (4th Cir. 1994)). After showing deliberate indifference, plaintiffs "must show a 'sufficiently close causal link' between the training deficiency and the alleged violation — that the violation was 'almost bound to happen.'" Cobb, 2018 WL 6304405, at *4 (quoting Spell, 824 F.2d at 1390).

Doe argues, largely in his reply brief, that the proposed amended complaint alleges facts sufficient to make out a failure to train claim. (Doc. 28 at 2.) Doe does not seem to argue that the proposed amended complaint shows "a pattern of tortious conduct by inadequately trained employees," and indeed the facts do not suggest such a pattern, as there are no instances of tortious conduct by inadequately trained employees alleged aside from the immediate incidents between Watring and Doe. Bd. of Cty. Comm'rs, 520 U.S. at 407–08. Rather, Doe argues that Judd and Hester continued to adhere to an approach they knew or should have known failed to prevent tortious conduct by their employees. (Doc. 28 at 2.)

Doe argues that Judd and Hester's failure to train their

employees on the school's policies for driving students home from school constitutes deliberate indifference. (Doc. 28 at 4.)[9] Doe's proposed amended complaint provides several factual allegations that teachers were aware that Watring drove Doe home from school, and that teachers did not enforce or report violations of the school's policy requiring written consent for someone other than a parent to drive a student home from school. (Doc. 25-1 ¶¶ 38, 40, 57, 79–82.)

To the extent the proposed amended complaint alleges that the school administrators failed to train Watring on the school's transportation policies, it fails to state a claim. The allegations do not suggest that Watring's "sexual abuse or molestation of a student was the 'plainly obvious consequence'" of the administrators' failure to train school employees on the policies for driving students home. Douglas v. Brookville Area Sch. Dist., 836 F. Supp. 2d 329, 362–63 (W.D. Pa. Dec. 8, 2011) ("A teacher's decision to provide a student with a ride to and from school does not inherently threaten the student's

---

[9] The amended complaint states that Durham Public School District Policy No. 4108 is attached as Exhibit A (Doc. 25-1 ¶ 98), Policy 5130 is attached as Exhibit B (Doc. 25-1 ¶ 104), Policy 4410.5/5125.5 are attached as Exhibit C (Doc. 25-1 ¶ 115), and that Policy 5126 is attached as Exhibit D (Doc. 25-1 ¶ 149). While these exhibits were attached to Doe's original complaint, there are no exhibits attached to Doe's proposed amended complaint. Nevertheless, because the policies are named and described in the complaint, the court accepts these exhibits as incorporated by reference to the proposed amended complaint, and thus they can properly be considered by the court. Plymouth Cty. Retirement Assoc. v. Primo Water Corp., 966 F. Supp. 2d 525, 536 (M.D.N.C. 2013).

welfare. . . . Consequently, the District's 'indifference' to the requirements of [the school's transportation policy] cannot be equated with its alleged 'indifference' to [plaintiff's] constitutional rights."); cf. Logan v. Bd. of Educ. of Sch. Dist. of Pittsburgh, No. 15-499, 2016 WL 463787, at *8 (W.D. Pa. Feb. 8, 2016) (finding that there were insufficient factual allegations for the court to plausibly infer that school defendants knew that students likely would be sexually assaulted by school personnel if the defendants failed to train school staff about when school district personnel could remove students from class, because a "teacher's decision to permit school [personnel] to remove students from classrooms does not inherently threaten the student's welfare" (quotation marks omitted)). To the extent Doe alleges that the school administrators failed to train other Creekside employees on enforcing the transportation policies, the amended complaint similarly fails to state a claim for the same reasons. The sexual abuse of a student is not the plainly obvious consequence of Judd and Hester's failure to train employees on the policies for driving students home. Douglas, 836 F. Supp. 2d at 364.

The proposed amended complaint also alleges that Judd and Hester failed to adequately train employees to properly identify potential sexual abuse and investigate and act upon allegations of sexual misconduct. (Doc. 25-1 ¶ 175.) As an initial matter, there

44

is no allegation that any claim of _sexual_ misconduct was made to Judd or Hester, so Doe has failed to provide facts sufficient to demonstrate that employees were not trained to "investigate and act upon allegations of sexual misconduct." (_Id._) The proposed amended complaint makes the conclusory allegation that "[a]n essential component of a sexual abuse policy minimally necessary to protect students is that complaints about inappropriate teacher-student relationships be taken at face value as true, and at a minimum, investigated." (Doc. 25-1 ¶ 107.) This conclusory allegation is insufficient to permit an inference that the school's sexual abuse policies were inadequate. See _Iqbal_, 556 U.S. at 681. Although Doe relies on _Doe by Watson v. Russell Cty. Sch. Bd._, that case is distinguishable because it involved school officials who had _no_ written policies, procedures, or guidelines regarding reported suspected abuse and neglect, while the proposed amended complaint alleges the existence of at least two School Board policies for reporting inappropriate teacher-student relationships and sexual harassment, and at least one policy for reporting harassment/bullying. (Doc. 28 at 2-7; Doc. 25-1 ¶¶ 104, 115, 149); _Russell Cty._, 2017 WL 1374279, at *3.[10]  Other than

---

[10] The court's decision in _Russell Cty._ was also based on the complete lack of policies or training in light of the "extensive rules and guidance from the state and federal government on sexual harassment and sexual violence in schools" that was included in the complaint. _Russell Cty._, 2017 WL 1374279, at *8. Doe's proposed amended complaint contains no similar allegations of state or federal rules or guidance that would have put Judd and Hester on notice of an obvious need for certain training

pointing to the policies for reporting inappropriate student-teacher behavior and bullying/harassment already put in place by the School Board that Doe claims, if followed, would have prevented constitutional injury, Doe provides only conclusory allegations in support of his failure to train theory against Judd and Hester. This is insufficient to establish a failure to train claim. See Gordon v. Kidd, 971 F.2d 1087, 1097 (4th Cir. 1992) ("A plaintiff must identify a deficiency in a training program closely related to the injury complained of and must further show that the injury would have been avoided 'under a program that was not deficient in the identified respect.'" (quoting City of Canton, 489 U.S. at 391); Koreny v. Smith, 2018 WL 1141513, at * 17 (W.D. Pa. Mar. 2, 2018) ("Her complaint points to nothing more than there were policies that, if followed, would have prevented the [vehicle accident], and because the vehicle accident occurred, it must have resulted from inadequate training. . . . Her complaint, at most, states a claim sounding in negligence, which is insufficient to state a plausible claim for violation of her substantive due process rights . . . .").

In sum, Doe has failed to plausibly allege that Judd and Hester's failure to train Creekside employees rose to the level of deliberate indifference. The amended complaint fails to allege

---

and the risks of not providing it to give rise to a claim of deliberate indifference.

either a pattern of sexual abuse stemming from the failure of Creekside's employees to detect or report signs of sexual abuse, or that the need to train Creekside employees to detect and report signs of sexual abuse of students by staff was so obvious — and the lack of such training so likely to result in sexual abuse — that Judd's and Hester's failure evidences deliberate indifference to Doe's rights.

Therefore, the motion to amend as to the failure to train claims against Judd and Hester will be denied as futile.

### b. Equal Protection Claims Against Individual DPS Defendants

#### i. Motion to Dismiss

The individual DPS Defendants argue that the complaint fails to allege intentional discrimination on the basis of sex to give rise to an equal protection claim. (Doc. 12 at 12–13, 21.) Doe does not address this theory in his response.

"To state an equal protection claim, a plaintiff must allege 'that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" J.W. v. Johnston Cty. Bd. of Educ., No. 5:11-CV-707-D, 2012 WL 4425439, at *8 (E.D.N.C. Sept. 24, 2012) (quoting Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001)). Courts have recognized that "sexual abuse by a teacher can deprive a student of his or her right to

equal protection under the law." T.E. v. Grindle, 599 F.3d 583, 587 (7th Cir. 2010) (citation omitted); Jennings, 482 F.3d at 725 (noting an "equal protection right to be free from sexual harassment in educational settings"); Hill v. Cundiff, 797 F.3d 948, 979 (11th Cir. 2015) (recognizing the "clearly established principle that deliberate indifference to sexual harassment is an equal protection violation"); but see Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 458 (5th Cir. 1994) (holding that a student's due process claim supersedes any equal protection claim arising from alleged sexual abuse by a teacher). Nevertheless, a plaintiff must allege sufficient facts that the defendant acted with discriminatory animus in order to state an equal protection claim. See Morrison, 239 F.3d at 654 ("To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."); see, e.g., B.A.L., 2016 WL 10570871, at *7 ("Courts considering similar situations [involving sexual abuse by a teacher] have declined to recognize an equal protection violation in the absence of any conduct, statements, or correspondence suggesting a Defendant had any discriminatory animus towards a victim."); J.W., 2012 WL 4425439, at *8.

Here, Doe alleges that the individual DPS Defendants failed "to treat Plaintiff, a male student, in the same manner as it would

have treated a female student subjected to abuse by a teacher of the opposite sex" (Doc. 1 ¶ 132), and that the Defendants' conduct "constituted disparate treatment of males and females and a disparate impact on minor male students," (id. ¶ 138; see id. ¶ 136). Doe alleges that the individual DPS Defendants failed to properly train employees to identify and report predatory sexual behavior or inappropriate involvement by a teacher with a student, regardless of the sex of the victim. (Id. ¶¶ 69-70.) However, the complaint does not contain sufficient factual allegations to support a plausible claim that any of the individual DPS Defendants acted with discriminatory intent toward Doe based on his gender. See B.A.L., 2016 WL 10570871, at *7 (holding that plaintiff failed to state a § 1983 claim for an equal protection violation based on gender discrimination because plaintiff failed to allege administrator acted with discriminatory animus); J.W., 2012 WL 4425439, at *9 (finding that plaintiff failed to state an equal protection claim where "[t]he only suggestion in the amended complaint that [defendants] discriminated against [student] due to his gender is plaintiffs' conclusory accusation that they did so"); cf. Grindle, 599 F.3d at 588–89 (affirming denial of motion for summary judgment as to equal protection claim against principal, holding that a reasonable jury could infer discriminatory purpose from evidence that principal knew of teacher's abuse of students and attempted to deliberately cover it up by misleading parents

and other school administrators).

Thus, the equal protection claims against the individual DPS Defendants will be dismissed.

### ii. **Motion to Amend**

The proposed amended complaint alleges that Judd and Hester violated Doe's right to equal protection by failing to treat Doe, a male student, in the same manner as they would have treated a female student subjected to abuse by a teacher of the opposite sex. (Doc. 25-1 ¶ 175.) The proposed amended complaint adds only the conclusory allegation that if a female student had talked about the same sexual topics as Doe, Judd and Hester would have been likely to conduct an investigation and notify her parents, which they did not do with Doe. (Id. ¶ 76.) This conclusory allegation is insufficient to permit an inference that Judd and Hester would have taken different remedial measures if similar reports had been made about a female student. See Iqbal, 556 U.S. at 681. Thus, the amended complaint does not contain sufficient factual allegations to support a plausible claim that Judd or Hester acted with discriminatory intent toward Doe based on his gender. See B.A.L., 2016 WL 10570871, at *7; J.W., 2012 WL 4425439, at *9.

Therefore, the motion to deny the proposed amended complaint as futile as to the § 1983 claims against Judd and Hester based on a violation of Doe's right to equal protection will be granted.

### c. Qualified Immunity

### i. Motion to Dismiss

Harris, Judd, and Hester argue alternatively that they are entitled to qualified immunity. (Doc. 12 at 14-15, 20-21.) Defendants do not contest that Doe's constitutional right to be free from sexual abuse by his teacher and their § 1983 supervisory liability for a school official were clearly established at the time of the individual DPS Defendants' alleged inaction. See Baynard, 268 F.3d at 235 & n.4. Rather, they contend that no conduct on their part violated a statutory or constitutional right that was clearly established at the time of their actions. (Doc. 12 at 15, 21.) Relying on a North Carolina Court of Appeals' decision discussing *public official immunity* under state law, Doe contends that the individual DPS Defendants are not public officials entitled to qualified immunity. (Doc. 15 at 11, 14 (citing Fraley v. Griffin, 720 S.E.2d 694, 696 (N.C. 2011)).) Apart from this contention, however, Doe offers no other argument to overcome qualified immunity.

Courts have regularly held that school officials may assert qualified immunity. See, e.g., Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 379 (2009) (holding that various school officials were entitled to qualified immunity); Fothergill v. Jones Cty. Bd. of Educ., No. 4:09-CV-190-BO, 2010 WL 4338101, at *1 (E.D.N.C. Oct. 22, 2010) (same); Kwarteng v. Morgan State Univ.,

128 F. App'x 301, 302 (4th Cir. 2005) (holding that district court did not misapply the qualified immunity doctrine to the disciplinary actions of individual defendants). Doe offers no federal case law to support his contrary assertion. Nor does the complaint allege facts that would plausibly suggest that the individual DPS Defendants were not performing discretionary duties or were engaged in conduct "entirely beyond their discretionary authority." In re Allen, 106 F.3d 582, 593 (4th Cir. 1997) ("[A]n official who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity under § 1983.").

Qualified immunity shields government officials performing discretionary functions from personal liability for civil damages under § 1983, so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (citations omitted). Officials are entitled to immunity unless the § 1983 claim satisfies a two-prong test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right, and (2) the right was "clearly established" such that a reasonable person would have known his acts or omissions violated that right. Id. For an alleged constitutional right to be clearly established, "[t]he contours of the right must be sufficiently

clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). This determination is to be assessed as of "the time an action [or inaction] occurred." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Accordingly, the scope of supervisory liability under § 1983 informs the court's analysis of whether a supervisor is entitled to qualified immunity. See Shaw, 13 F.3d at 802; Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999) ("[C]ourts consigned to struggle with neglect-of-risk cases generally have incorporated a review of the merits of derivative tort liability into the qualified immunity calculus."). In light of the clearly established standard for supervisory liability, the court must determine whether a reasonable person in the supervisor's position could have believed that his or her conduct was lawful. Shaw, 13 F.3d at 802-03.

For reasons similar to those discussed as to the merits, the court finds that the individual DPS Defendants are entitled to qualified immunity. As to Harris, the complaint fails to plausibly allege any affirmative act or omission by him that would give rise to supervisory liability. See Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 731 (3d Cir. 1989) (holding that a superintendent was entitled to qualified immunity where the court could not "discern from the record any affirmative acts by [the

53

superintendent] on which [plaintiff] can base a claim of toleration, condonation or encouragement of sexual harassment by teachers which occurred in one of the various schools within his district"); B.A.L., 2016 WL 10570871, at *8 (holding assistant superintendent was entitled to qualified immunity where the plaintiff failed to allege that the superintendent engaged in affirmative acts that demonstrated he either tolerated or condoned the relationship between the student and teacher). The complaint fails to plausibly allege that Harris was either aware of or actively involved in a substantial part of the activity relating to Watring.

While the complaint's allegations regarding Judd and Hester are not as sparse as those against Harris, the facts alleged, viewed in the light most favorable to Doe, are nevertheless insufficient to have informed a reasonable administrator that his or her conduct "violate[d] clearly established statutory or constitutional rights." Shaw, 13 F.3d at 803 (quoting Harlow, 457 U.S. at 818). As previously discussed, the complaint fails to establish a plausible claim that either Hester or Judd acted with deliberate indifference under the clearly established standard for supervisory liability. But even if one assumes that Judd's or Hester's alleged conduct exhibited deliberate indifference, a reasonable person in either of their positions still could have believed that his or her conduct was lawful. Id. at 802-03 ("Even

if Smith did arguably exhibit deliberate indifference, he is entitled to qualified immunity. Smith meets the standard for qualified immunity set forth in <u>Harlow</u>[]: a reasonable officer, in light of clearly established legal rules, could have believed his conduct was lawful."). Put another way, there are insufficient facts alleged to suggest that the conduct of either of the administrators was so inadequate, in light of the activity alleged at the relevant times, as to render it constitutionally infirm. The administrators responded when facts were brought to light involving both Watring and Doe. While the administrators may be faulted for not promptly alerting Doe's parents immediately following the March 18, 2009 meeting, they did involve Doe's mother after discovering the love note, and she appeared to downplay any concern for a period of time. When the situation escalated thereafter to suggest a more serious risk, the administrators quickly responded, not hesitating to call in law enforcement, even in light of Watring's denials.

For these reasons, the court finds that the individual DPS Defendants are entitled to qualified immunity, and the § 1983 claims against them should be dismissed.[11]

---

[11] Because dismissal is based on insufficient factual allegations on the merits as well as to overcome qualified immunity, dismissal is without prejudice. <u>See</u> <u>Armstrong</u>, 190 F. Supp. 3d at 472 (dismissing individual capacity claim against chief of police without prejudice, noting "this court cautions that baring [sic] some sort of link sufficient to overcome qualified immunity, it is unlikely that a future claim against [defendant police chief] would stand").

## ii. Motion to Amend

Judd and Hester argue that nothing in the proposed amended complaint cures the defects of this claim and they are therefore entitled to qualified immunity. (Doc. 27 at 19-21.) Doe contends that because qualified immunity is a defense, the court should await the completion of discovery before reaching the issue. (Doc. 28 at 11.)

Doe's amended complaint fails to allege facts that, if true, make plausible a claim that sexual abuse of Doe should have been so obvious to any reasonable school administrator prior to April 23, 2009, that Judd and Hester's failure to conduct an investigation or take other action was a clearly-established violation of Plaintiff's right to be free from sexual abuse from his teacher. See Fothergill, 2010 WL 4338101, at *1-2 (where a student had a sexual relationship with his teacher, rumors of the relationship were rampant among students and faculty, teachers teased the student about the relationship, the student spent a suspicious amount of time with the teacher on school grounds, and the teacher behaved inappropriately with the student in public, the court determined that school officials were entitled to qualified immunity because, since the allegations failed to show that the school officials knew about the sexual relationship, there was no way that a reasonable person in the school defendants' position would have understood that they were violating the

plaintiff's rights against sexual abuse from his teacher).

Although Doe urges the court to permit discovery to reveal additional evidence before reaching this issue, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the <u>earliest possible stage</u> in litigation" because "[q]ualified immunity is 'an <u>immunity from suit</u> rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" <u>Scott v. Harris</u>, 550 U.S. 372, 376 n.2 (2007) (second emphasis in original) (first quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (per curiam); then quoting <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985)).  Defendants have asserted qualified immunity and met their burden of demonstrating it.  Therefore, the motion to amend the complaint as to the § 1983 claims against Judd and Hester will be denied as futile.

> **d.  State Tort Claims**

> > **i.  Motion to Dismiss**

> > > **(a)  Official Capacity Claims**

DPS Defendants first argue that the official capacity claims against Harris, Judd, and Hester are duplicative in light of the pending claims against the School Board and should be dismissed.  (Doc. 16 at 2–4.)  Doe concedes the § 1983 claims against the individual DPS Defendants in their official capacity should be dismissed as duplicative under federal law, but he contends that

the state tort claims against them in their official capacities are not duplicative under state law. (Doc. 15 at 6-7.)

"[O]fficial capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Talley v. City of Charlotte, No. 314-CV-00683-MOC-DCK, 2016 WL 8679235, at *13 (W.D.N.C. July 22, 2016) (quoting Kentucky v. Graham, 473 U.S. 159, 165 (1985)); Moore v. City of Creedmoor, 481 S.E.2d 14, 21 (N.C. 1997). Accordingly, where the plaintiff asserts a claim under state law against a government entity, the court has the discretion to dismiss official capacity claims against individuals working for this government entity as duplicative. See Talley, 2016 WL 8679235, at *13; Harrison v. Chalmers, 551 F. Supp. 2d 432, 438 (M.D.N.C. 2008).[12] Here, the

---

[12] Doe relies on the North Carolina Court of Appeals decision in McCoy v. Coker for the proposition that the dismissal of official capacity claims against the individual Defendants for state law claims would be improper. (Doc. 15 at 6-7 (citing McCoy v. Coker, 620 S.E.2d 691, 696 (N.C. Ct. App. 2005).) In McCoy, the court of appeals held that the trial court did not err in failing to dismiss as duplicative negligence claims against a building inspector in his official capacity where plaintiff also asserted claims against the government entity. McCoy, 620 S.E.2d at 696. As DPS Defendants note, however, the court did not hold that an official capacity claim against an individual could never be dismissed as duplicative. (Doc. 16 at 2-4.) Nor does subsequent case law suggest that a dismissal would be inappropriate in this instance. See, e.g., Phifer v. City of Rocky Mount, No. 5:08-CV-292-FL, 2010 WL 3860411, at *8 (E.D.N.C. Sept. 28, 2010) (rejecting similar argument that state law claims against individual defendants in their official capacity should not be dismissed as duplicative); Wright v. Town of Zebulon, 688 S.E.2d 786, 789 (N.C. Ct. App. 2010) (affirming dismissal of state law claims against individual police officers in their official capacity where plaintiff asserted a claim against the government entity).

state tort claims against the individual DPS Defendants in their official capacities are duplicative and will be dismissed, where the School Board is a named party and will remain so moving forward. See Talley, 2016 WL 8679235, at *13 (dismissing negligence claims against individual police officers in their official capacity where plaintiff asserted claim against the government entity); Grisson v. City of Fayetteville, No. 5:14-CV-272-BO, 2015 WL 5797661, at *6 (E.D.N.C. Oct. 2, 2015) (same).

### (b) Public Official Immunity

The individual DPS Defendants argue that the state tort claims against them in their individual capacity should be dismissed because they enjoy public official immunity. (Doc. 12 at 15, 17–18, 21–23.) Doe contends that these Defendants are not public officials for purposes of public official immunity. (Doc. 15 at 11–14.)[13]

"The North Carolina Court of Appeals has held that school system superintendents, principals, and assistant principals are 'public officials' for purpose of public official immunity." RM, 2017 WL 2115108, at *4 (citations omitted). Therefore, Harris, Judd, and Hester are each public officials, given their positions as superintendent of DPS, principal of Creekside, and assistant

---

[13] DPS Defendants also argue that the state tort claims should be dismissed because the complaint fails to state a claim against them. (Doc. 12 at 11–14, 19–20.) Having found that the individual DPS Defendants are subject to dismissal on other grounds, this contention need not be reached.

principal of Creekside, respectively.  Id.

"A public official may not be held individually liable for mere negligence, but may only be liable where his/her conduct is malicious, corrupt or outside the scope of his/her authority." Id. (citing Dalenko v. Wake Cty. Dep't of Human Servs., 578 S.E.2d 599, 603-04, writ denied, 585 S.E.2d 380 (N.C. 2003)).  However, a conclusory allegation that a public official acted maliciously, corruptly, or outside the scope of his or her duties is insufficient to overcome public official immunity.  Id. (quoting Meyer v. Walls, 489 S.E.2d 880, 890 (N.C. 1997)).  A plaintiff must allege facts sufficient to support such a conclusion.  Id. As with qualified immunity, the availability of public official immunity depends on the reasonableness of the officer's actions. See Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013) ("An officer acts with malice when he 'does that which a man of reasonable intelligence would know to be contrary to his duty,' i.e., when he violates a clearly established right." (quoting Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003)); Grad v. Kaasa, 321 S.E.2d 888, 890-91 (N.C. 1984) ("An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." (quotations omitted)).

Here, Doe alleges claims of negligence and negligent infliction of emotional distress against each of the individual

DPS Defendants but fails to allege that they acted maliciously, corruptly, or outside the scope of their duties to give rise to liability for such claims. At the outset of the complaint, Doe alleges that each of the individual DPS Defendants was "acting or failing to act within the scope, course, and authority of his [or her] employment and his [or her] employer." (Doc. 1 ¶¶ 20, 22, 24.) However, the complaint contains no additional allegations that any of the individual DPS Defendants ever acted outside the scope of his or her employment. The only other direct allegation is found in the § 1983 portion of the complaint, where it alleges in relevant part: "The actions and omissions of the DPS Defendants, individually and collectively, as described herein, after receiving repeated notice that Plaintiff's constitutional rights were being violated, were wanton, willful, and/or evidence a conscious disregard for Plaintiff's rights." (Id. ¶ 143.) These conclusory allegations are insufficient to overcome the individual DPS Defendants' public official immunity. Farrell v. Transylvania Cty. Bd. of Educ., 625 S.E.2d 128, 134 (N.C. Ct. App. 2006); RM, 2017 WL 2115108, at *4. Doe's negligence claims are tied to the reasonableness of the individual DPS Defendants' conduct. See Cooper, 735 F.3d at 160. As previously noted, the complaint fails to allege sufficient facts to establish a plausible claim that the individual DPS Defendants engaged in conduct that exceeded mere negligence. Accordingly, the individual DPS Defendants are

entitled to public official immunity, and the state tort claims against them will be dismissed.  See <u>Grisson</u>, 2015 WL 5797661, at *7; <u>RM</u>, 2017 WL 2115108, at *4–5.

### ii.  Motion to Amend

Doe's third claim for relief in his proposed amended complaint alleges negligence by Judd and Hester in their official capacities. (Doc. 25-1 at 56.)  Doe argues that these claims are not duplicative of the negligence claim against the School Board. (Doc. 24 at 13–16.)  Defendants argue that these official capacity claims are futile because they are duplicative of the negligence claims brought against the School Board.  (Doc. 27 at 21–23.)  For the same reasons as discussed for the official capacity claims alleged under the original complaint, the negligence claims against Judd and Hester in their official capacities are duplicative and will be dismissed, as the School Board is a named party and will remain so moving forward.

## III. CONCLUSION

For the reasons stated, therefore,

IT IS ORDERED that Doe's motion to dismiss (Doc. 11) is GRANTED and all claims against Defendants Judd, Hester, and Harris in their official and individual capacities are hereby DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Doe's motion to amend the complaint (Doc. 23) is DENIED as futile as to the claims against Defendants

Judd and Hester; Doe's motion to amend is otherwise GRANTED, as no Defendant has opposed amendment as they affect the remaining claims.

/s/   Thomas D. Schroeder
United States District Judge

January 25, 2019